506 A.2d 455

In the Matter of The **ADOPTION OF Lisa Marie EMBICK,** a/k/a Lisa Marie Pletcher, A Minor.

**Appeal of Ronald EMBICK and Donna Pletcher Embick.**

Superior Court of Pennsylvania.

Argued Oct. 23, 1985.

Filed March 20, 1986.

492

Charles R. Rosamilia, Jr., Lock Haven, for appellants.

Before ROWLEY, OLSZEWSKI and MONTEMURO, JJ.

MONTEMURO, Judge:

This is an appeal from the final decree terminating the parental rights of appellants, Ronald E. Embick (hereinafter Ronald) and Donna Pletcher Embick (hereinafter Donna) in their daughter Lisa Marie Embick, also known as Lisa Marie Pletcher (hereinafter Lisa). Our thorough review of the record and application of the appropriate standard of review compels us to conclude that the determination of the court below is well supported by the evidence. Accordingly we affirm.

Appellants have presented two questions for review:

1. Whether the Clinton County Children and Youth Agency (hereinafter Agency) has established by clear and convincing evidence the grounds for involuntary termination of parental rights under Sections 2511(a)(2) and (a)(5) of the Adoption Act of 1980?[1]

2. Whether a licensed psychologist can, without the written consent of his/her patient be examined in a civil matter as to information acquired in the course of his/her professional services on behalf of such client?[2] The second question appears to be one of first impression in this jurisdiction.

---

1. Act of October 15, 1980, P.L. 934, No. 163, § 1, *as amended*, 23 Pa.C.S. § 2101 *et seq.*

2. Appellants also objected to the testimony of Colleen M. Bonnadeo, a caseworker for the Divine Providence Mental Health Center. The basis for the objection was predicated on a confidential relationship between counselor and client. Appellants have relied on the statute above set forth, and it is clear that the statute is not applicable because Ms. Bonnadio is not a licensed psychologist. We note further that the issue is waived for failure to comply with Pa.R.A.P. 2116 [requirement to set forth statement of questions involved in appellate brief].

We shall discuss the second question first.

Appellants challenge the ruling of the court below which admitted the testimony of Dr. Patricia Piper, a licensed psychologist. They argue that Dr. Piper's testimony concerned confidential communications between a psychologist and client and, thus, were privileged.

The psychologist-client privilege relied upon by appellants reads as follows:

> No person who has been licensed under the act of March 23, 1972 (P.L. 136, No. 52), to practice psychology shall be, without the written consent of his client, examined in any civil or criminal matter as to any information acquired in the course of his professional services in behalf of such client. The confidential relations and communications between a psychologist and his client shall be on the same basis as those provided or prescribed by law between an attorney and client.

Act of July 9, 1976, P.L. 586, No. 142 § 2, 42 Pa.C.S. § 5944 (footnote omitted).

All parties agree that Dr. Piper is a *licensed* psychologist in Pennsylvania and has been ever since 1977. Nor can her qualifications be seriously questioned; she has earned an undergraduate degree in psychology, a master's degree in counseled psychology, and a doctorate in counseled psychology. All her degrees were earned at Duke University. For five (5) years she worked at the Children's Psychiatric Institute where she did an internship. Following her internship, she returned to Pennsylvania in 1978. From 1978 until the date of the hearing in this matter she has been engaged in private practice. (N.T.T.H. at 56–57).[3]

Dr. Piper testified that she examined the appellants and Lisa at the request of the Agency. She stated that the purpose of her examination was two-fold: first, she was asked to see if anything could be done to reunite the family and, second, she was to make an assessment as to what

---

**3.** "N.T.T.H." refers to the notes of testimony taken at the termination hearing on July 12, 1983.

would be in Lisa's best interests as far as permanent placement. (N.T.T.H. at 57).

Dr. Piper also testified that she informed the natural mother that the results of her testing would be shared with other people, and that that was always her practice when a child was involved. (N.T.T.H. at 59).

The testimony of Dr. Piper which was sought to be excluded by appellant's reliance on the psychologist-client privilege may be summarized as follows:

When asked what testing was done by her, Dr. Piper testified that because of Lisa's age (she had just recently turned two), no formal testing was done. In Lisa's case, Dr. Piper stated that she spent five (5) hours with her, watching her in the presence of only her foster parents, watching her in the presence of only the appellants, and watching her in the presence of only her foster mother. It was, according to Dr. Piper, a matter of observing and playing with Lisa, and gauging her development accordingly. (N.T.T.H. at 59).

Dr. Piper testified that Lisa was shy with her when she was with her foster parents, but was very warm with her foster parents. She sat on her foster mother's lap and on her foster father's lap, played nicely with toys, and talked and sang while she was with them. The same was true when Lisa was seen just with her foster mother. (N.T.T.H. at 58).

Dr. Piper continued her testimony by stating that when she observed Lisa with her natural parents, the child screamed loudly, "I want my mommy, I want to get out." She refused to sit on her natural father's lap, and eventually fell asleep in her natural mother's lap, screaming until shortly before falling asleep. (N.T.T.H. at 58).

Dr. Piper testified that with the weekly visits the appellants had with Lisa, she would have expected to see more of a relationship between appellants and Lisa, and that she would have expected Lisa to be more comfortable in their presence. (N.T.T.H. at 58). Lisa, according to Dr. Piper,

was desperately unhappy when she was in appellants' presence. (N.T.T.H. at 59).

■ At this point we should observe that the range of applicability of Pennsylvania's psychologist-client privilege has been defined as being the same as the attorney-client privilege. 42 Pa.C.S. § 5944. In *Commonwealth v. Goldblum*, 498 Pa. 455, 464, 447 A.2d 234, 239 (1982), our supreme court said: "Between an attorney and client the privilege is confined to confidential communications." Thus, even assuming that Lisa was Dr. Piper's client, and certainly she was not, Dr. Piper's testimony concerning Lisa was based on visual observation of Lisa while alone with her natural parents, and alone with her foster parents. There were no confidential communications.

When asked what testing was done on the appellants, Dr. Piper testified that they were both given the Wexler Adult Intelligence Scale Revised Test as well as sentence completion items and discipline techniques. (N.T.T.H. at 57).

Dr. Piper testified that Donna's testing showed her to be functioning in the mentally retarded range with a verbal I.Q. of 65, a performance I.Q. of 74, which is borderline range, and an overall full-scale I.Q. of 68, which is in the mentally retarded range.[4] (N.T.T.H. at 60).

With reference to her other tests, Dr. Piper stated that the natural mother showed woeful inadequacies in her responses to discipline techniques, and also with regard to child development milestones. By way of example, Dr. Piper testified that the natural mother said that a child should be eighteen (18) years old before being left alone in the house, yet at age two (2) a child should be able to clean a bedroom, living room and help with the dishes. Further, the natural mother said a child should be fourteen (14) years of age before it could cross the street. The natural mother told Dr. Piper that Lisa was eating *fifty (50)* jars of baby food a day, and when asked how she would know if a child was sick, she said you would rush her to the hospital if

4. See footnote 12 *infra.*

the child's temperature was over ninety (90) degrees, seventy (70) to eighty (80) being normal. (N.T.T.H. at 60).

Dr. Piper concluded by saying that in her opinion Donna was not capable at the time of hearing to provide Lisa with the care that would be considered adequate parenting. (N.T.T.H. at 61).

With reference to Ronald, the natural father, Dr. Piper testified that while he had a higher intellectual ability [5] and a better understanding of safety rules for children, he was unaware of the emotional needs of the child, and was incorrect as to what could be expected of a child at different ages. For example, Dr. Piper stated that when asked why Lisa should be returned to them, Ronald responded that she should not be returned at this time because they were not capable of keeping her, but that he would like to see her taken from the foster home so that she would be forced to turn toward them, the appellants, for affection. When asked how he thought Lisa would feel about such a removal, he at first replied, "I don't know, I'm not here", and when asked again he said, "well, she would get over it in a couple of days. She would be a little unhappy but she would get over it pretty quickly." (N.T.T.H. 62, 63). Dr. Piper opined that such a removal of Lisa from one foster home to another for the purpose suggested by the natural father would be devastating for Lisa.

Dr. Piper testified that in her opinion the natural father was not capable of parenting Lisa. Dr. Piper also was of the opinion that Lisa's permanent placement with her foster parents by way of adoption would best serve her needs and welfare.

Was Dr. Piper's testimony concerning the natural parents, offered by the Agency as part of its case on involuntary termination of parental rights, privileged and therefore

---

5. In the Adjudication and Decree Nisi, the court below found as Finding of Fact No. 72 that the natural father had an I.Q. of 84 and that his mental ability to care for a child is borderline. Although this finding was not challenged by appellants, we have not found support for this finding in the record before us, and therefore it will be disregarded.

inadmissable under the psychologist-client privilege? We think not, and find no abuse of discretion in its admission by the hearing judge.

Our research has failed to unearth any Pennsylvania case wherein the psychologist-client privilege has been asserted when the issue before the court was, as in the case *sub judice,* whether parental rights should be involuntarily terminated. Those cases where the statutory privilege was asserted are easily distinguished.[6]

At common law the attorney-client relationship was the only professional association protected by an evidentiary privilege. 8 J. WIGMORE, EVIDENCE, § 2286, n. 17

6. *Commonwealth v. Goldblum,* 498 Pa. 455, 447 A.2d 234 (1982), *Commonwealth v. Garcia,* 478 Pa. 406, 387 A.2d 406 (1978), and *Commonwealth v. Petrino,* 332 Pa.Super. 13, 480 A.2d 1160 (1984), *cert. denied,* —— U.S. ——, 105 U.S. 2149, 85 L.Ed.2d 505, were all cases wherein testimony was sought to be excluded on the basis of the psychologist-client privilege. 42 Pa.C.S. § 5944. However, all three cases were criminal proceedings (the defendant in each case being charged with murder); further, in all three cases it was clear that the statements sought to be excluded were made by a person who was clearly being *treated* by a psychiatrist/psychologist, and the relationship of physician-patient or psychologist-client was never in question.

In the case of *In re B,* 482 Pa. 471, 394 A.2d 419 (1978), the privilege which was implicated was the "physician-patient" privilege, not the "psychologist-client" privilege. In *In re B,* our supreme court held that the physician-client privilege did not prohibit the disclosure of certain psychiatric records; however, *in a plurality opinion,* the court concluded that the testimony concerning those records was barred by the patient's constitutional right to privacy. In the case before us, appellants never challenged the introduction of Dr. Piper's testimony on any ground other than the statutory privilege, and thus the constitutional issue is not properly before us. However, even if the constitutional issue were properly before us, our decision would be no different. "Constitutional analysis involves a balancing of competing interests. A court's duty does not end once the individual's interests are identified. The government's interests must also be identified and weighed.... If the government's interests are compelling, the individual's constitutional right to privacy may be required to yield, provided that the government has not employed unnecessarily broad means for achieving its purposes." *Commonwealth ex rel. Platt v. Platt,* 266 Pa.Super. 276, 307, 404 A.2d 410, 426 (1979) (Spaeth, J. dissenting). Here we would hold that the state's interest in the proper placement of children, as well as the state's interest in keeping families intact whenever possible, is an important and compelling interest which outweighs the individual's right to privacy.

(McNAUGHTON'S rev. ed. 1961). In the early fifteen hundreds, the theory of the attorney-client privilege was objective rather than subjective—"a consideration for the *oath and the honor* of the attorney rather than for the apprehensions of his client." *Id.* at § 2290 (emphasis in original). However, since the latter part of the seventeen hundreds the new theory, which prevails today, evolved, grounded on the subjective consideration that, "in order to promote freedom of consultation of legal advisers by clients, the apprehension of compelled disclosure by legal advisers must be removed...." *Id* § 2291. This concept of freedom of consultation was recognized by this court in *Commonwealth v. Hutchinson*, 290 Pa.Super. 254, 263, 434 A.2d 740, 744 (1981) when, we said "[a] fundamental purpose of the attorney-client privilege is to foster full communication between an attorney and his client."

This Commonwealth, like most of our sister states, mindful of the common law rule that "no pledge of privacy nor oath of secrecy can avail against demand for truth in a court of justice", WIGMORE, *supra*, § 2286, passed legislation to protect disclosure of communications in certain other relationships, e.g., physician-patient, 42 Pa.C.S. § 5929; confidential communications to news reporters (the so-called Pennsylvania Shield Law), 42 Pa.C.S. § 5942; confidential communications to clergymen, 42 Pa.C.S. § 5943; confidential communications between psychologist and client, 42 Pa.C.S. § 5944; confidential communications to school personnel, 42 Pa.C.S. § 5945 and, most recently, confidential communications with sexual assault counselors, 42 Pa.C.S. § 5945.1. The common law attorney-client privilege was codified in the Act of May 23, 1887, P.L. 158, No. 89, § 5(d), 28 P.S. § 321, *repealed* and *reenacted* by Act of July 9, 1976, P.L. 586, No. 142, § 2, *effective* June 27, 1978, 42 Pa.C.S. § 5928.

There can be no doubt that the purpose of the psychologist-client privilege is to encourage people to seek professional help for their mental or emotional problems, and that purpose is best accomplished when people in need of psy-

chotherapeutic treatment know that what they tell their therapist during treatment will not be disclosed to anyone. In a concurring and dissenting opinion in *Commonwealth ex rel. Platt v. Platt, supra,* former President Judge Spaeth wrote that, "General agreement exists in the legal and medical worlds that confidentiality of communications between patients and therapists is the *sine qua non* of successful psychiatric treatment." *Id.,* 266 Pa.Superior Ct. at 305, 404 A.2d 425. (citations omitted.)

It cannot be gainsaid that society desires to protect and provide succor for the relationship of psychologist and client, and that without the confidentiality which the privilege provides, many people would simply forego therapeutic treatment.

■ With that rationale as the underpinning in support of non-disclosure of confidential communications between client and psychologist, should the privilege be applicable where appellants, as in the case at bar, agreed to be examined by Dr. Piper at the request of the Agency? For several reasons, we think not.

First, there has been no showing that appellants were Dr. Piper's clients in any sense of that term. They were not seeking treatment, or counseling, or advice for any mental or emotional problems; in fact, as we read this record, we doubt that either appellant would ever even remotely suggest that any mental or emotional problems might exist. They went to see Dr. Piper because they were asked to do so by the Agency, and for the limited purpose of examination. We therefore hold that under the facts of this case, the relationship between appellants and Dr. Piper was not the type of relationship contemplated by the statute which confers the privilege.

Second, we are satisfied from our own reading of the record that appellants knew Dr. Piper would, at the very least, report back to the Agency if not directly to the court, the results of her examination; therefore, appellants had no

expectations that their communications with Dr. Piper would be held confidential.

Third, there can no longer be any doubt concerning the requirement of a full and comprehensive hearing in involuntary termination cases. In *In re Adoption of James J.*, 332 Pa.Super. 486, 491, 481 A.2d 892, 894 (1984) (*en banc*) this court stated:

> Insofar as termination cases are concerned, intimations of broad appellate review or broad scope of review should properly relate to the appellate court's duty to ensure that the trial court has satisfactorily fulfilled the requirements of examining all evidentiary resources, conducting a full hearing and setting forth its decision in a full discursive opinion. While, unlike custody cases, the termination cases have not repeatedly verbalized the requirement of comprehensiveness, it is clear from a reading of the cases that the requirement is engrafted on the law. *Accord, In re Adoption of J.S.M,, Jr.*, 492 Pa. 313, 424 A.2d 878; *In re D.J.Y.*, 487 Pa. 125, 408 A.2d 1387 (1979); *In Interest of C.M.E.*, 301 Pa.Super. 579, 448 A.2d 59 (1982).

Interestingly, the *nisi prius* courts as well as the appellate courts considered the testimony, without objection, of psychiatrists and/or psychologists (in some cases both) in the following involuntary termination of parental rights cases: *In Re Adoption of Michael J.C.*, 506 Pa. 517, 486 A.2d 371 (1984); *In re William L.*, 477 Pa. 322, 383 A.2d 1228 (1978), *cert. denied* 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192; *In re Adoption of B.K.W. and D.M.W.*, 348 Pa.Super. 333, 502 A.2d 235 (1985); *Matter of Adoption of Ferrante*, 334 Pa.Super. 53, 482 A.2d 1076 (1985); *In re Adoption of James J., supra; In the Interest of C.M.E.*, 301 Pa.Super. 579, 448 A.2d 59 (1982). We are convinced that in each of these cases the testimony of the psychiatrists and psychologists, although not necessarily conclusive, greatly assisted the courts—at both the hearing below and on appeal—in the decision to grant or refuse the petition to involuntarily terminate parental rights.

■ It would be anomalous to insist that the hearing court examine all evidentiary resources, conduct a full and comprehensive hearing, and, at the same time, deprive the hearing court of material testimony concerning the mental or emotional condition of the natural parents. Where, as here, the record demonstrates that a piercing of the wall of protected communications between the natural parents and the psychologist is both material and necessary to a proper determination of issues before the court, the statutory privilege protecting such communications must yield. *See, Perry v. Fiumano,* 403 N.Y.S.2d 382 at 386, 61 A.D.2d 512 (1978) (custody case).

■ Fourth, the analysis suggested by Dean Wigmore would compel the conclusion that the statutory psychologist-client privilege must yield to disclosure of the communications under the facts of this case. Wigmore said that four criteria must be satisfied to justify an evidentiary privilege: (1) the communications must originate in the confidence that they will not be disclosed; (2) the element of confidentiality must be essential to the full and satisfactory maintenance of the relationship between the parties; (3) the relationship must be one which, in the opinion of the community, ought to be sedulously fostered; and (4) the injury that would inure to the relationship by the disclosure of the communication must be greater than the benefit thereby gained for the correct disposal of litigation. WIGMORE, *supra,* § 2285.

With reference to the first three conditions, since we have already held that under the facts of this case there simply was no true relationship of psychologist and client in any sense of that term, we can safely say that none of these conditions have been satisfied.

With reference to Dean Wigmore's fourth condition, even if we were to concede that a relationship did exist, we would hold that the injury that would inure to the relationship by the disclosure of the communication, where the court is concerned with proper placement of the child as well as the possibility of keeping the family intact, is not greater than

the benefit thereby gained for the correct disposal of the delicate and complex societal issues before the court in cases such as this.

For all of the above reasons, the hearing court was correct in its decision to permit the psychologist to testify.[7]

We shall next address appellant's contention that the Agency failed to prove by clear and convincing evidence the grounds for involuntary termination of parental rights under Sections 2511(a)(2) and (a)(5) of the Adoption Act of 1980. (*See* n. 1 *supra* ).

Lisa was born out of wedlock on January 30, 1981. She is now five (5) years of age and, with the exception of the first three months of her young life, she has lived continuously with her foster parents, Elmer and June Eisenhower (hereinafter the "Eisenhowers") in Clintondale, Pennsylvania. The Eisenhowers now wish to adopt Lisa.

Subsequent to Lisa's birth she resided with Donna and Christina Reynolds, her paternal grandmother, in a trailer at the Pine Acres Trailer Court in Lock Haven, Pennsylvania. The trailer was owned by the grandmother. The record is not clear where the natural father, Ronald, was living at the time of Lisa's birth.

On or about April 8, 1981, when Lisa was just a little over two months of age, Donna apparently had a disagreement with the paternal grandmother, and as a consequence, she and Lisa left the trailer to move in with a girl named Cindy Shade who lived in an apartment on Corning Street in Lock Haven.

Shortly thereafter, the paternal grandmother received reports from her sons and another daughter-in-law that Lisa was being badly neglected, that she was being thrown on the bed, that she was filthy and being mistreated. (N.T.

---

7. For an excellent discussion of the statutory privilege on child placement cases, see, Guernsay, *The Psychotherapist-Patient Privilege on Child Placement—A Relevancy Analyses,* 26 VILL.L.REV. 955 (1981).

C.H. January 20, 1982 at 5).[8]   On April 20, 1981, the paternal grandmother went to the apartment of Cindy Shade, and Lisa was turned over to her by Ms. Shade. (N.T.C.H. December 8, 1981 at 5).   The paternal grandmother, in response to a question from the Agency's counsel, said, "I kidnapped that baby for the baby's welfare." (N.T. C.H. December 8, 1981 at 15).   She went directly from Ms. Shade's apartment to the Williamsport Hospital in fear that Lisa would die before she got there.   She said that Lisa "wouldn't smile.   She wouldn't even move.   She wouldn't move her head." (N.T.C.H. January 20, 1982 at 5).   Lisa was admitted to the Williamsport Hospital by one Dr. Williams who assumed temporary protective custody of the child.

The next day, April 21, 1981, the Agency took protective custody of Lisa because of parental neglect.

On April 22, 1981, the natural parents, Ronald and Donna, consented to a voluntary placement of the child with the Agency *on condition that the child not be placed with the paternal grandmother.* (N.T.C.H. December 8, 1981, at 16, testimony of paternal grandmother).   On the same day, April 22, 1981, the court below entered an order transferring custody, and placed Lisa with the Agency.

8.   "N.T.C.H." refers to the notes of testimony of a custody hearing. The custody petition was filed by the paternal grandmother for custody of Lisa.   Although it is not clear from the record, the custody petition was filed sometime in August of 1981.   From our own independent review of the notes of testimony on the custody hearings, held on December 8 and 9, 1981 and January 20, 1982, we agree with the court below that the natural parents, Ronald and Donna, signed a consent to custody of Lisa in favor of petitioner, paternal grandmother, only after they were told by the Agency that in view of their lack of cooperation with implementation of the service placement plan that termination of parental rights, and ultimately the adoption of Lisa might occur.   (See Opinion of Court below in Custody Case at p. 5. See also N.T.C.H. p. 11, December 8, 1981, Testimony of Ronald). The court below filed an Opinion and Order on December 8, 1982 denying the paternal grandmother's petition for custody, and directing that primary custody remain with the Agency.   No appeal was ever taken from this Order.   All parties have agreed that the N.T.C.H. be made a part of this record.

A little over two (2) years later, on May 17, 1983, the Agency filed a petition to involuntarily terminate the parental rights of appellant, Ronald and Donna. Testimony was taken on July 12, 1983.[9] On May 31, 1984, the court below filed an Adjudication and a Decree Nisi terminating the parental rights of appellants, Ronald and Donna, and directing that custody of Lisa be transferred to the Agency pending adoption.

Appellants filed exceptions to the court's findings of fact, and objections to the decree nisi on June 11, 1984. Following the filing of a transcript of the proceeding and the briefs of the parties, on November 15, 1984, the court below filed an Opinion and Order on March 30, 1985, dismissing appellants exceptions and objections and denying their requested relief.[10]

**9.** The hearing judge in the court below was the Honorable Carson V. Brown, the President Judge of Clinton County. Judge Brown also presided at the custody hearings in this matter. We should note also that Judge Brown appointed an attorney to represent the interests of the minor. The child's advocate was Merritt E. McKnight, Esquire, a member of the Clinton County Bar.

**10.** Although the "Order" entered by the court below on March 30, 1985 was not referred to as a "Final Decree", it is clear that the effect of this Order was the same as a "Final Decree", and certainly appellants have considered it as such. Aside from the fact that this proceeding was initiated over $2\frac{1}{2}$ years ago, in the interest of judicial economy, we shall consider this appeal as being taken from entry of Final Decree. In this connection we are reminded of Justice Larsen's admonition in *In re Davis*, 502 Pa. 110, 146, 465 A.2d 614, 632–33 (1983) wherein he expressed a widely-held, compassionate and, we feel, correct view concerning delays in child placement cases:

The courts, social agencies, and all the adults concerned with child placement must greatly reduce the time they take for decision. While the taking of time is often correctly equated with care, reasoned judgment, and the assurance of fairness, it often also reflects too large and burdensome caseloads or inefficiently deployed resources. Whatever the cause of the timetaking, the costs as well as the benefits of the delay to the child must be weighed. Our guideline would allow for no more delay than that required for reasoned judgment. By reasoned judgment we do not mean certainty of judgment. We mean no more than the most reasonable judgment that can be made within the time available—measured to accord with the child's sense of time. Therefore to avoid irreparable psychological injury, placement, whenever in dispute, must be treated as the emergency that it is for the child.*

This court sitting *en banc* in *In Re Adoption of James J., supra,* delineated the appropriate standard of review. In reviewing a termination order our appellate function is limited to a determination of whether the decision to terminate parental rights is supported by competent evidence. We must employ a broad, comprehensive review of the record; however, unless the court below has abused its discretion or committed an error of law, the order must not be disturbed.

■ From the holding of the Supreme Court of the United States in *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), we are compelled to recognize that the burden of proof on the party seeking to terminate parental rights is one of clear and convincing evidence. *See also: In Re Adoption of Michael J.C., supra; In Re Adoption of B.K.W. and D.M.W., supra; In Re Adoption of Baby Boy Allen,* 337 Pa.Super. 133, 486 A.2d 517 (1984); *Lookabill v. Moreland,* 336 Pa.Super. 520, 485 A.2d 1204 (1984); *In Re Baby Boy P,* 333 Pa.Super. 462, 482 A.2d 660 (1984).

In the case at bar, the court below terminated appellants' parental rights pursuant to both 23 Pa.C.S. § 2511(a)(2) and § 2511(a)(5), which, respectively, read:

(a) **General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental wellbeing and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . . .

(* Three months may not be a long time for an adult decision-maker. For a young child it may be forever.)

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(b) **Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

Guided by the above stated standard of review and the burden of proof, we shall review the record and determine whether the Agency has proved by clear and convincing evidence the necessary elements of § 2511(a)(2) and § 2511(a)(5).

We will not reverse the court below unless it is apparent that that court abused its discretion, committed an error of law, or lacked evidentiary support for its findings. "Following the involuntary termination of parental rights by the Orphans Court our scope of review is limited to determining whether the decree of termination is supported by competent evidence." *In Re Adoption of Michael J.C., supra,* 506 Pa. at 521, 486 A.2d at 373 (1984).

The court below in an extensive, thorough and searching analysis, filed ninety-one (91) findings of fact, which we shall attempt in pertinent part to summarize. We shall also supplement the findings of the court below with those of our own as gleaned from our independent review of the record.

Jeanne Monoski, an Agency caseworker, attempted to be of assistance to the natural mother, Donna, *even before the Agency took custody.* On March 31, 1981, Donna admitted to Ms. Monoski that she had a short temper and lacked patience when it came to caring for Lisa; also, she admitted screaming at Lisa when the child cried, that she became easily frustrated, and that she needed help in dealing with the pressures of raising a child because it was too much for her. Ms. Monoski, on that same day, discussed counseling with Donna, and found her agreeable to the idea. Ms. Monoski also spoke to Donna about getting involved with the Infant Development Program (hereinafter I.D.P.) to work on parenting skills, about making sure that she kept doctors' appointments for Lisa, and, further, informed Donna that the Agency would continue to monitor the case in order to see that Lisa was being fed and clothed properly, and that her needs were being met.

The Agency considered the paternal grandmother's residence for foster home placement but did not select her because of the opposition of the natural parents, and also because of the presence of the parental grandmother's seventeen (17) year old son, Jonathan Embick, who apparently had emotional problems of his own.

On April 23, 1981, Lisa was placed in the foster home of Elmer and June Eisenhower in Clintondale, Pennsylvania, and has resided there ever since. As we have already indicated above, from the age of about three (3) months to her present age of five (5) years, Lisa has lived with her foster parents who now wish to adopt her.

Upon coming into custody of the Agency, the child was diagnosed as anemic, and in May of 1981, when observed by the I.D.P., she was pale, thin, lethargic, apathetic and underweight based upon age, birthweight and normal weight gain in infants. Further testing revealed developmental delays in the areas of poor head control, weak sucking reflexes, abnormal visual tracking pattern with left eye drift, asymmetrical head shape, gross motor-control delay, abnormal pattern with arms and lack of vigorous

movement. There was no medical reason for the existence of these developmental problems which were attributable solely to the environment and under-nutrition.

The foster parents actively participated in the program, and have administered the care prescribed by the I.D.P.; Lisa progressed well, and has since been discharged. Since April 22, 1981, the Agency has attempted to work with the natural parents for the return of the child, and the Agency formulated a placement service plan, the goal of which was to return Lisa to her natural parents. Under this plan, the parents were to: (1) establish a permanent residence; (2) seek counseling to help Donna with her bad temper and lack of patience in caring for Lisa as well as the stablization of the parents' relationship with each other and the family unit; (3) become involved with the I.D.P. to work on parenting skills; (4) establish an acceptable way of life by learning budgeting, food shopping and homemaking skills; and (5) secure employment to support the family.

In order to implement the plan, both parents were to receive counseling from the mental health/mental retardation (MH/MR) office in Lock Haven; they were both to become involved with an agency known by the acronym STEP for budgeting, homemaking and parenting skills; and they were both to become involved with the I.D.P. to develop parenting skills. The natural father, Ronald, was to seek employment through CETA and the employment office. The parents were to be involved with all these other providers within three (3) months of May 4, 1981.

The Agency's caseworker testified that she first reviewed the placement plan with both natural parents on May 7, 1981, and two further times with Donna to be certain she understood it. Donna said she understood the plan, and the caseworker gave her the telephone numbers of MH/MR, the I.D.P., the STEP office, the CETA office and the unemployment office.

Thereafter the caseworker again reviewed the plan with one or both natural parents on May 8, 1981, August 5, 1981, November 17, 1981, February 9, 1982, May 11, 1982, August

10, 1982, November 5, 1982 and January 18, 1983. On each occasion they refused to sign even though they understood what was needed, and either gave no reason for the refusal or indicated they wanted to await the outcome of the Petition for Custody which had been filed by the paternal grandmother sometime in *August of 1981*. The plan was finally signed by both parties sometime after January 18, 1983.

Visitation initially was to be twice a month at the Agency's offices and the length of placement was projected to be one year.[11]

The natural parents have only once exercised their right to appeal the plan to the Department of Public Welfare and in that appeal the objection was not to the plan itself but to the continued placement of the child at the Eisenhower home. The appeal was dismissed by the Department of Public Welfare for lack of jurisdiction.

The natural parents have not become involved with counseling at MH/MR even though on at least sixteen occasions beginning on March 31, 1981, and continuing up to January 18, 1983, the Agency discussed the need for counseling with one or both natural parents. On at least three occasions, the caseworker gave Donna the telephone number of MH/MR to encourage her to make an appointment, and on one occasion had her call from the Agency office to make an appointment, which appointment the parents failed to keep.

On at least twelve occasions one or both of the natural parents stated that counseling was unnecessary.

In early June, 1983, *after* the filing of the instant termination petition, the parents did meet with Colleen Bonnadeo, a counselor with MH/MR, and requested *only* marital counseling. Ronald stated to Ms. Bonnadeo that he did not need counseling but was there only because the Agency was requiring counseling as part of the placement plan.

11. Our review of the record reveals that the length of placement was accepted for six months—not one year. (N.T.T.H. at 18)

Even though on at least fourteen occasions beginning with the date of March 31, 1981 through November 5, 1982, the Agency caseworker discussed the need for the natural parents to become involved with the I.D.P. to work on parenting skills, they have never participated in that program. Indeed, the natural father stated that he would not go to anyone for help in budgeting money.

On at least sixteen occasions beginning April 10, 1981, and continuing to January 18, 1983, the Agency caseworker discussed the need for adequate housing, and on at least three occasions gave Donna telephone numbers to call about a place to live. On one occasion, the caseworker gave Donna a list of six apartments available for rent.

Prior to February 9, 1982, the natural parents moved into a trailer near the paternal grandmother. On February 9, 1982 and ever since that date, the parents have refused to allow the Agency to inspect their residence. The natural mother told Ms. Bonnadeo that the trailer had only one bedroom and a living room, that the only cooking facility was a hot plate and that she has to do her dishes at her mother-in-law's trailer.

The natural parents did get married during the foster home placement, but are now separated, with Ronald living in his mother's trailer, and Donna remaining in the trailer they had occupied before the separation.

The natural father did work in the CETA program for a period of time in 1983 but was unemployed at the time of the hearing on the termination petition.

As we have already said, the paternal grandmother sought custody of Lisa in August of 1981, but following hearings on December 8, 1981, December 18, 1981 and January 20, 1982, the court ordered that primary custody remain in the Agency. The parties to this termination proceedings have stipulated that the notes of testimony in the custody case be made a part of the record in these termination proceedings.

After entry of the Order in the custody case on December 8, 1982, the Agency's caseworker met with the natural parents to advise them that since the parents' failure to follow the placement plan may have been due to their hope that the paternal grandmother would be granted custody, they would be given another opportunity. However, the parents made little or no effort to work on the plan after that meeting.

Throughout the foster placement, the parents have had the opportunity to visit with the child at least twice a month, and for a period of time weekly visits were arranged. The parents have missed only about twenty per cent (20%) of the scheduled visits.

The purpose of the visits was to allow the parents to see the child and to work on parenting skills. Unfortunately, and because of their complete lack of cooperation and/or interest, the parenting skills have not improved in over two and one-quarter (2¼) years of foster placement.

The caseworker and the foster mother were available during visits to help the parents with their skills.

The parents have never successfully fed the child a complete meal although feeding was always a part of most of the visits. The father's typical reaction to the child's crying during feeding was to walk away and sometimes just wait out in the car. The mother is unable to deal with the child's crying during meals.

Both natural parents admitted at the time of the termination hearing that they were presently unable to care for the child or to have custody of the child.

In our analysis of appellants' second claim of error concerning the alleged improper allowance by the court below of privileged communications, we have already discussed in part the testimony of Dr. Piper. Although that testimony, which we now incorporate herein, is pertinent to our present analysis of appellants' first claim of error that the Agency failed to meet its burden of proof by clear and convincing evidence, we shall not repeat it. We shall, however, set

forth those findings, made by us and the lower court concerning Dr. Piper's testimony, which have not yet been referred to.

Neither parent has an adequate understanding of the child's psychological needs and, sadly, the natural mother stated that she wanted the child removed from the foster home even if that would be harmful to the child.

Dr. Piper stated that counseling is mandatory before the parents could care for the child, and that the expressed attitude of the parents before the termination hearing bars the possibility of any effective counseling. According to Dr. Piper, the parents are not presently capable of caring for the child and were no more capable of caring for her at the time of the termination hearing, July 12, 1983, than they were in April of 1981.

Dr. Piper stated that the placement service plan was a reasonable plan to bring about a reunion of the family, and that she knew of no other service reasonably available which should have been offered to the family. Further, Dr. Piper stated that a number of visits between the parents and the child should have created more of a relationship than she observed. The relationship between the child and the foster parents is a strong one according to Dr. Piper, and should not be disturbed since the parents are not capable of custody.

In the doctor's opinion, adoption would be in the best interest of the child so long as the foster parents, the Eisenhowers, are the adopting parents. Dr. Piper also testified that a placement with the paternal grandmother would not be in the child's best interests.

The natural father told Dr. Piper that he did not think that he and the mother could care for the child *until she was about fifteen (15) years of age.*

The paternal grandmother admitted that the placement service plan was reasonable and needed by the parents.

The Agency's caseworker stated that no improvement has been seen in the ability of the parents to care for the child

over the two and one quarter (2¼) years of foster placement. The parents are still lacking parental capabilities in the same way as in April of 1981, and no significant progress has been made since then.

Nothing has occurred which would indicate that continued placement would allow the natural parents to improve conditions, and the Agency knows of no other services which it could reasonably offer the parties.

The foster parents will be the adoptive parents in the event parental rights are finally terminated and custody will remain with the Agency until finalization of adoption.

Johnathan Embick, the parental grandmother's 17 year old son, moved to the home of another relative in the New Jersey Shore area shortly before the termination hearing.

The natural parents and the paternal grandmother want custody transferred to the paternal grandmother, who would then be responsible for training the parents, and deciding when to return the child to them.

At the time of the hearing, Donna already had given birth to a second child, April Katrina, born June 7, 1982. Custody of April was transferred to the paternal grandmother.[12]

█ The learned hearing judge in the court below first discussed the grounds for termination under the provisions of 23 Pa.C.S. § 2511(a)(2) (See p. 19 supra for entire text of this Section), and correctly observed that three requirements must be met before the rights of parents may be terminated: (1) there must be repeated and continued incapacity, abuse and neglect or refusal with respect to the

12. Appellants say in their brief to this court that Donna has given birth to a third child who is also in the care of the paternal grandmother. However, the record does not support this, and we are bound by the record. But even so, assuming that Donna did have a third child, we find appellant's argument that siblings should not be separated but instead raised together to be disingenuous to say the least. Lisa, except for her first three months of misery and neglect, has for the five years of her life lived exclusively with the Eisenhowers; therefore, no "separation" of siblings is involved here. Just as importantly, appellants do not argue that they want Lisa; instead, they say that the paternal grandmother should assume the burden of rearing another child.

child; (2) the parental incapacity, abuse and neglect or refusal causes that child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

With regard to the first requirement, the hearing court stated: "It does not strain reality to conclude that it has been established by clear and convincing evidence that both incapacity and neglect by both parents has been established." The hearing court considered the previous voluntary placement of the child with the Agency, together with the neglect and lack of parenting which existed for the first three months of Lisa's life, as a basis for finding incapacity and neglect in both parents. In further support of the first requirement, the court also considered the lack of developmental skills in the child brought about as a result of her environment, together with the other evidence showing that neither parent has any basic conception of the needs of a small child. The court also questioned whether the parents have the inclination or ability to provide for these needs.

With regard to the second requirement, the hearing court found that the parental incapacity and neglect or refusal to provide adequate parenting caused Lisa to be without essential care, control or subsistence.

In discussing the third requirement, the hearing court recognized that the placement plan prepared by the Agency has not been met, and that the appellants never made a good faith effort to comply with various aspects of the plan. That court correctly observed that appellants rejected any attempt to receive or cooperate with counseling for the purpose of developing parental skills, and further that they demonstrated an attitude of non-compliance with the various aspects of the placement plan. The hearing court found that, in particular, no efforts have been made to ameliorate the appellant/natural mother's temper and lack of patience in dealing with a small child. The fact that appellants were separated at the time of the hearing demon-

strated their lack of progress in stabilizing their own relationship. After correctly observing that appellants failed to become involved with the Infant Development Program to improve parenting skills, the lower court concluded, "[T]here is very little present in the case on behalf of the natural parents to suggest that they can remedy their incapabilities, or more importantly, that they are inclined to want to do this." Lower court adjudication, filed June 1, 1984, at 17.

The hearing judge next discussed the grounds for termination under the provisions of 23 Pa.C.S. § 2511(a)(5) (See pp. 19–20, *supra* for entire text of this Section), and recognized that five requirements must be met before the rights of parents may be terminated: (1) the child must have been removed from its parents for at least six months; (2) the conditions which led to the initial removal continue to exist; (3) the parents cannot or will not remedy such conditions within a reasonable time; (4) services or assistance reasonably available to the parents are not likely to remedy the conditions which led to the removal within a reasonable period; and (5) termination would best serve the needs and welfare of the child.

The court below found all five requirements present. There is no question that Lisa has been in foster care for more than six months. With regard to the second requirement, the court below concluded that the conditions which led to Lisa's placement and removal continue to exist; and that appellants have failed to develop, to any meaningful degree the requisite parenting skills and attitudes which led to the conditions of placement.

In discussing the third requirement the lower court stated that it was evident that the appellants cannot or will not remedy these conditions within a reasonable period of time. The hearing court referred to the testimony of Dr. Piper, with regard to her attempts to work with the appellants, as important in that it demonstrated little motivation to improve. Instead, the court observed that appellants' "attitude is one of resistance predicated upon the erroneous

notion that they are capable parents and need no outside assistance." Lower court adjudication, filed June 1, 1984, at 18.

With regard to the fourth requirement, the court below found that, primarily because the appellants are unwilling or unable to utilize the services or assistance available to them, it was obvious that such services or assistance as were available were not likely to remedy the conditions which led to removal or placement of Lisa within a reasonable period of time.

Finally, with regard to the fifth requirement, the court below concluded that termination of parental rights would best serve the needs and welfare of Lisa. (See § 2511(b) *supra,* p. 20). This conclusion was supported by the opinion of Dr. Piper, and by the testimony of Ronald, the natural father, that neither he nor Donna could take care of the child until she reached age fifteen, which the court found to be an unreasonable amount of time for Lisa to wait for a meaningful relationship with her biological parents.

Thus, the court below held that the provisions of both 23 Pa.C.S. § 2511(a)(2) and (a)(5) were applicable, and that the Agency had proven its case for involuntary termination of parental rights by evidence which was both clear and convincing.

Following a comprehensive review of the evidence,[13] we conclude that the court below acted within its discretion in terminating appellants' parental rights.

13. In this review, we have placed little or no reliance on appellants' I.Q. scores. We are guided by our supreme court's analysis in *In re William L.,* 477 Pa. 322, 351–52 n. 26, 383 A.2d 1228, 1243 n. 26 (1978):
> Experts generally agree that socially and culturally disadvantaged people tend to score lower on standardized intelligence tests, which suggests that cultural bias may affect the result. See Galliher, Termination of the Parent-Child Relationship: Should Parental I.Q. be an Important Factor?, Law and the Social Order 855, 865–66 (1973). Moreover, 'No Study has ever documented the premise that unintelligent parents are unable to give love and affection.' *Id.* at 871. Consequently, we consider appellant's test scores only as a factor among many relevant to her incapacity to meet the essential needs of her children.

We do not reach this conclusion lightly or in haste. These are truly difficult and heart-rending cases which "represent a delicate tension between two of our society's most fundamental precepts: the right of a parent to exercise the rights and obligations of a parent toward his child, free from governmental intrusion, and society's interest in the nurturing, care, safety and training of children." *In re Adoption of James J., supra,* 332 Pa.Superior Ct. at 492, 481 A.2d at 895.

Appellants would have us believe that the underlying problem in this case was the Agency's ineffectiveness in providing them with necessary services or assistance in developing parental skills. Nothing could be further from the truth. It is beyond question that appellants not only failed to take advantage of the Agency's facilities but, in fact, actively resisted the Agency's attempts to provide such services. Ronald, the natural father, was adamant in his repeated assertion that he was not in need of services and, in several respects, absolutely refused any assistance.

The court below was correct in rejecting appellants' assertions that they achieved the goals set forth by the Agency in the various placement plans. We further agree with the court below that there is nothing in the record "except demonstrated instability on behalf of both of the natural parents and their claim to having developed adequate parenting skills depends solely upon their own testimony which the Court rejects in the face of the evident facts in the case." Lower court opinion, filed April 1, 1985, at 3. Our review of the evidence suggests that appellants' relationship between themselves is as stable as jello, and that their relationship with the paternal grandmother, on whom they heavily rely as a source of assistance in developing parenting skills, is at best suspect.[14]

14. Appellants' theory of "assistance" is to award custody of Lisa to the paternal grandmother. As we have already indicated, the court below, following three hearings, denied the parental grandmother's petition for custody of Lisa and no appeal was ever taken from that decision. Here we do not review that custody decision; rather, our inquiry is limited to a determination of whether or not the Agency

Appellants' argument that Dr. Piper indicated that Ronald could develop parenting skills after one or two years of intensive counseling is correct as far as it goes. However, the record clearly shows that Dr. Piper also testified that, because of Ronald's admitted hostility toward receiving assistance, she did not believe that he would ever develop adequate parenting skills with respect to Lisa. But even if we were persuaded, and we are not, that Ronald *could* develop these skills, he himself indicated it would take fifteen years. The only evidence in this record concerning appellants' ability to improve their parenting skills was their own testimony, which was in conflict with most of the other testimony and evidence regarding their efforts. The court below, as was its right to do, gave little or no credence to appellants' testimony.

In *Appeal of Diane B.,* 456 Pa. 429, 433, 321 A.2d 618, 620 (1974), our supreme court stated:

A parent has the responsibility to provide care, control, and subsistence for his or her child, and a 'duty to love, to protect and to support [the] child.' *Wischmann Adoption Case,* 428 Pa. 327, 331, 237 A.2d 205, 207 (1968). This parental obligation 'is a positive duty and requires affirmative performance.' *Smith Adoption Case,* 412 Pa. 501, 505, 194 A.2d 919, 922 (1963); *see Owen Adoption,* 51 Pa.D. & C.2d 761, 767–768 (C.P.Mercer County 1971).

It has recently been stated:

'Parenthood is not ... a mere biological status, or passive state of mind which claims and declines to relinquish ownership of the child. It is an active occupation, calling for constant affirmative demonstration of parental love, protection and concern.... [A parent] must exert himself to take and maintain a place of importance in the child's life, and must exercise reason-

met its burden of proof, by evidence which was clear and convincing, that the requirements of 23 Pa.C.S. § 2511(a)(2) and/or (a)(5) have been met.

able firmness in declining to yield to obstacles. Otherwise, he cannot perform the job of parent, and the parent-child relationship will deteriorate as the absent parent more and more gives his thoughts, attentions, concern and priorities to his own life and associates.'

*In re: Adoption of J.R.F.*, 27 Somerset L.J. 298, 304–305 (Pa.C.P.1972)

In *Lookabill v. Moreland, supra,* 336 Pa.Superior Ct. at 524, 485 A.2d at 1206, our court stated:

The Pennsylvania Supreme Court has often observed that parental obligations require a continuing interest in the child and rest affirmatively on the parents. *Matter of Adoption of David C.,* 479 Pa. 1, 387 A.2d 804 (1978) [*disapproved, Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599]; *In re W.M. III,,* 482 Pa. 123, 393 A.2d 410 (1978). The parent must exert a genuine, sincere effort to establish and maintain communication, association, and a place of importance in his or her child's life. *Matter of Adoption of David C., supra.* Although favorable circumstances may enable some parents to achieve this goal with little effort, the pertinent inquiry is not the degree of success a parent may have had in reaching his or her child, but whether he or she has utilized all available resources to preserve the parental relationship. *In re Adoption of B.D.S.,* 494 Pa. 171, 431 A.2d 203 (1981).

The Agency having proven by clear and convincing evidence the grounds and requirements of both 23 Pa.C.S. § 2511(a)(2) and (5), we affirm the order terminating appellants' parental rights.

Lisa should now be given the opportunity to extricate herself from the transitional state of foster or institutional care, and establish a true parent-child relationship through adoption.

Order affirmed.