612 A.2d 465

**In re ADOPTION OF STEVEN S., a minor.**

**Appeal of R.S.**

**In re ADOPTION OF STEVEN S., a minor.**

**Appeal of J.M.S.**

Superior Court of Pennsylvania.

Argued March 17, 1992.

Filed July 7, 1992.

248

Michael Hahalyak, Pittsburgh, for Robert Schoenfeld.

Raymond N. Sanchas, Pittsburgh, for Janice M. Schoenfeld.

Judith Patterson, Pittsburgh, for appellee.

Thomas O. Schmitt, Pittsburgh, for Allegheny County Children & Youth Services, participating party.

Before ROWLEY, President Judge, and CIRILLO and BROSKY, JJ.

ROWLEY, President Judge:

In these related appeals, R.S. ("Father") and J.M.S. ("Mother") appeal from the final judgment[1] terminating their parental rights with regard to their son, Steven. In his appeal, docketed in this Court at No. 1317 Pittsburgh 1991, Father raises the following issues: (1) whether Children and Youth Services (C & YS) failed as a matter of law to establish the necessary elements to entitle it to terminate the parental rights of the father in that the alleged conditions which led to the removal or placement of the child do not exist; (2) whether C & YS illegally, arbitrarily, and unconstitutionally restricted his visitation rights, delayed the return of the child to his natural family, and failed to promote reunification of the family; (3) whether the trial court erred in applying the bonding principle and the best interests of the child approach so as to deny Father his parental rights; and (4) whether the trial court misinterpreted the recommendation of the expert psychologist in finding that the child should not be returned unless he himself favors the return. In her appeal, docketed at No. 1335 Pittsburgh 1991, Mother raises the following issues: (1) whether the trial court erred in determining that grounds for termination of her parental rights were supported by clear and convincing evidence, and (2) whether the trial court erred in determining that termination of her parental rights will best serve the child's needs and welfare. After thoroughly reviewing the record and considering the arguments of the parties, we affirm.

Mother and Father were married in 1981. Father had a son and a daughter from a previous marriage. Mother and

1. The trial court entered an order and final judgment, rather than a decree nisi and final decree.

Father have four other children, including Steven. Both Steven and the son from Father's previous marriage reside in foster homes. The other four children reside with Mother and Father.

Steven was born on May 17, 1983. On June 21, 1983, Steven's parents took him to Suburban General Hospital where he was treated for a broken leg. Because the hospital personnel found the nature of the fracture to be inconsistent with the parents' explanation of the cause, C & YS was notified concerning possible abuse. A Juvenile Court hearing was conducted, after which Steven was returned to his parents.

Approximately one month later, a visiting nurse found Steven to be in an extremely emaciated condition. A C & YS caseworker obtained an ex parte court order permitting her to take Steven to the hospital. The emergency room physician diagnosed Steven as suffering from malnutrition. He remained in the hospital for five days and was then placed in a temporary foster home. In September, 1983, he was found to be dependent and placed in a regular foster home, where he now resides. His foster parents wish to adopt him.

In August, 1986, C & YS filed a petition for the involuntary termination of Mother's and Father's parental rights. Hearings on the petition were conducted, and on May 3, 1991, the trial court entered an order terminating Mother's and Father's parental rights. Exceptions were denied on June 29, 1991, and the order was made final. These appeals were then filed.

■ Termination of appellants' parental rights was based on 23 Pa.C.S. § 2511(a)(5), which provides the following:

The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \* \* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with

an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(5). A party seeking involuntary termination of parental rights must prove the above five elements by clear and convincing evidence. *In re Adoption of J.J.*, 511 Pa. 590, 594, 515 A.2d 883, 885–86 (1986). In reviewing the trial court's decision to grant the petition to terminate,

the scope of appellate review is limited to the determination of whether the decree of termination is supported by competent evidence. If the decree is adequately supported by competent evidence, and the chancellor's findings are not predicated upon capricious disbelief of competent and credible evidence, the adjudication of the Orphans' Court terminating parental rights will not be disturbed on appeal. [ ...] [U]nless the Orphans' Court abused its discretion or committed an error of law, its findings are entitled to the same weight given a jury verdict. The trial court, as trier of fact, is the sole judge of credibility of witnesses. Conflicts in testimony are to be resolved by the trier of fact and we may not disturb a decree of Orphans' Court based upon findings supported by the record unless Orphans' Court applies an incorrect legal standard.

*In re Adoption of B.J.R.*, 397 Pa.Super. 11, 15, 579 A.2d 906, 908 (1990) (quoting *Adoption of J.J., supra* 511 Pa. at 593–94, 515 A.2d at 885–86 (citations omitted)).

With these standards in mind, we have thoroughly reviewed the record and conclude that the trial court did not err in granting the petition to terminate. On the basis of the testimony and evidence presented at the hearing, *see*

Trial Court Opinion at 3–23, the trial court made the follow-
ing factual findings and conclusions from those findings:

The two incidents that led to Steven's removal established
that his home environment seriously jeopardized Steven's
health and safety. In September, 1983, Steven was found
to be a dependent child requiring placement outside the
home because of inadequate explanations for bruises on
his face and a leg fracture and because of a dramatic
weight loss and malnourishment for which there was no
reasonable explanation other than neglect.

C & YS's reunification requirements were reasonable.
The incidents that led to Steven's removal strongly sug-
gested that Steven's birth had disrupted the functioning
of this family. Consequently, it was reasonable for C &
YS to require the parents to complete a MHMR assess-
ment and to complete any counseling which the assess-
ment recommended as a condition for Steven's return.
To date, the family has not been willing to permit such an
assessment.

It was also reasonable for C & YS to require the parents
to participate in a program that addressed parenting
skills and child developmental issues and that evaluated
the parents' abilities to relate to and to care for Steven.
It was approximately two years before the parents were
willing to participate in such a program. At that time,
the staff of this program concluded that they were not
capable of responding to Steven's needs.

With the passage of time during which Steven remained
outside the home, the need for successful parental partic-
ipation in a program designed to assist the parents in
responding to Steven's needs increased. Because Steven
is being raised in a foster home, he has come to view the
foster parents as his parents and his natural parents have
become insignificant. Consequently, it is difficult for his
parents to re-establish a relationship with Steven without
the assistance of professionals who are capable of assist-
ing the parents in understanding the child's views and
needs and the manner in which they must respond. This

is an area in which the parents have made no progress because of their inability to work with professionals and to understand Steven's situation.

This case is unusual in that there are presently four other children in the [S.] home. The children appear to be doing well in a family that appears to be providing appropriate care. This suggests that it may have been possible for the parents to have met the reunification requirements if there had been more cooperation between the parents and C & YS. However, a constant antagonistic relationship between the father and C & YS resulted in the issues leading to Steven's removal being no more resolved today than they were at the time of the removal. From the outset, the father's response to C & YS was one of complete mistrust, an unwillingness to believe that there was any justification for Steven's removal, and an insistence that matters be done his way because C & YS's methods were based on its bureaucratic needs rather than the needs of the parents and their children.[2] C & YS's caseworkers viewed the father's responses as a validation of their beliefs that his personality traits prevented him from being a competent parent for Steven. They responded to the father's attacks on C & YS by assuming a defensive position. What evolved was that both the father and the C & YS staff view themselves as victims of the other's demands.

Although there have been regular reviews in the Juvenile Court, the Juvenile Court's actual participation in this ongoing and very lengthy conflict has been minimal. For

**2.** For example, although the parents knew that C & YS required all letters and cards to Steven to be sent through C & YS rather than directly to Steven, they insisted on repeatedly sending cards and letters directly to Steven at his foster home. Pursuant to C & YS directives, the foster parents refused these cards and letters. As a result, Steven never received them. Because the letters and cards were returned to the natural parents, they knew that their failure to follow C & YS policy resulted in the loss of any benefit these cards and letters may have provided to Steven and to their relationship with him. Nonetheless, they refused to abide by C & YS policy. Although this is a relatively minor infraction, it reveals the parents' refusal to place Steven's needs above their own.

the most part, C & YS has been prepared to accept the status quo that involved hourly visits every other week. While the father was dissatisfied with the status quo, he involved the court primarily in fending off actual and anticipated efforts by C & YS to take away what he had. He never sought to present evidence that might convince this court that Steven should be returned (as opposed to objecting to the initial decision concerning the child's removal) on the basis of changed circumstances. He also never requested more specific guidance from the court with respect to reunification requirements.

What was unusual in these termination proceedings is the amount of testimony that each party offered to justify the lack of progress. At this time, however, the issue is not who should have done more to resolve the ongoing conflict. Services were made available to the family. They choose [sic] not to avail themselves of the services. As a result, the family is not in a position to care for Steven at this time. They have not successfully completed any programs that would assist them in understanding the needs of a seven year old child who has lived his entire life with another family. They have not shown any ability to follow the suggestions of any professionals with respect to their responses to Steven.

Trial Court Opinion at 23–27. After reviewing the record, we conclude that the trial court's factual findings and its resolutions of factual disputes, upon which the above conclusions are based, are amply supported by the record. With this in mind, we will address the parents' arguments.

## I. FATHER'S APPEAL

In his first issue, Father contends that C & YS failed to satisfy the necessary statutory elements by clear and convincing evidence. Specifically, he argues that C & YS "produced no testimony whatsoever to establish that the alleged propensities on the part of the father to abuse the child (all of which he always denied) 'continued to exist'." Father's Brief at 33.

 It is true, as Father contends, that C & YS case-workers stated that he was not a dangerous person, that the trial court remarked that he was fit to be around children, and that psychological tests did not reveal a propensity for child abuse. *See id.* at 33. Nonetheless, sufficient evidence was presented which clearly and convincingly revealed that Steven did not receive adequate care during the first two months of his life. Although the parents have repeatedly and continually denied abusing or neglecting Steven, this factual dispute has been decided against them. After viewing the evidence of record, most notably the evidence reflecting Steven's physical condition when he was removed, we cannot say that the determinations concerning abuse and neglect lack support. Moreover, their failure to remedy these problems within the past eight years, indeed their failure to acknowledge these problems in the face of overwhelming evidence,[3] sufficiently supports a conclusion that they will not remedy the conditions within a reasonable period of time.

Father next contends that C & YS, a governmental unit mandated to aid him, illegally, arbitrarily, and unconstitutionally restricted his visitation rights, delayed the return of the child to his natural family, and failed to promote reunification of the family. We have reviewed the record and find these assertions to be unfounded. Rather, the record reveals that C & YS's initial goal was to reunite the family and services were offered to appellants in an attempt to reach that goal. However, because appellants did not avail themselves of those services, and accordingly, the condi-

---

**3.** When Steven was removed from the home, he was diagnosed as suffering from malnourishment. When he was born, he was in the ninety-fifth percentile for weight. When he was removed from the home, he was only in the fifteenth percentile for weight. Moreover, as evidenced by the photographs which were included in the record, he was extremely emaciated in appearance. In light of this evidence, the parents' explanations that he was eating normally but was thin due to the profuse sweating caused by the heat of their apartment and the cast which he was in are not reasonable or credible. Their continued inability or refusal to recognize the problems which obviously existed is further evidence that the conditions leading to Steven's removal still exist.

tions leading to Steven's removal were not remedied, C & YS's goal was changed to adoption. However, even after the goal was changed to adoption, C & YS advised appellants that the adoption recommendation would be revised if appellants became more involved and made progress towards meeting Steven's needs. In addition, C & YS told appellants that it would not refer the case to the Adoption Department in order to provide yet another opportunity to them to "make diligent efforts toward the reasonably prompt assumption of full parental responsibilities." *In re J.W.*, 396 Pa.Super. 379, 392, 578 A.2d 952, 959 (1990). Although appellants did then attend the Parental Stress program, their sessions were terminated due to a lack of progress and because of the adverse effects visits were having on Steven.[4]

█ In a situation such as that presented in this case, both the parents and C & YS have duties to promote reunification.

> [The parents'] 'affirmative duty,' at minimum, requires a showing by the parent of a willingness to cooperate with the agency to obtain the rehabilitative service necessary for the performance of parental duties and responsibilities. The agency must, of course, put forth a good faith effort in making services available to the parent, and once it has done so on a continuing basis, it has discharged this obligation.

*Adoption of J.J., supra* 511 Pa. at 602, 515 A.2d at 890 (emphasis omitted). We have thoroughly reviewed appellants' arguments as well as the evidence of record and have found nothing from which we could conclude that Steven's return to the family will be possible within a reasonable period of time where eight years have passed and no progress toward this goal has been made. Although the fact that Father and Mother have successfully been raising

---

**4.** We note that appellants apparently contacted other social service agencies which provided other parenting programs. According to Father, C & YS refused to approve appellants' participation in these agencies. According to the caseworkers, these agencies were not appropriate for this case.

four other children is evidence that they do possess parenting skills, it does not negate the fact that they were not properly caring for Steven. Their apparent parental abilities with respect to their four other children also did not obviate the need to identify and remedy the problems leading to Steven's removal. The parents' unwillingness to recognize and confront these problems has made any improvement virtually impossible. *See In re Adoption of Embick*, 351 Pa.Super. 491, 516–17, 506 A.2d 455, 469 (1986) (parents' "attitude is one of resistance predicated upon the erroneous notion that they are capable parents and need no outside assistance"), *allocatur denied*, 513 Pa. 634, 520 A.2d 1385 (1987). "[Steven] should now be given the opportunity to extricate [himself] from the transitional state of foster ... care, and establish a true parent-child relationship through adoption." *Id.*, 351 Pa.Superior Ct. at 520, 506 A.2d at 471.

■ Father also asserts that the trial court improperly based its decision on the fact that Steven is bonded to his foster parents and not his natural parents. In support of his allegation of error, Father cites a case involving custody, *In re Donna W.*, 325 Pa.Super. 39, 472 A.2d 635 (1984) (*en banc*). In *Donna*, an *en banc* panel of this Court rejected a "psychological bonding presumption," that is, a presumption, "as a matter of law[,] that where the evidence discloses strong 'psychological bonding' to the foster parents, an award to the natural parent is contrary to the children's best interests." *Id.*, 325 Pa.Superior Ct. at 57, 472 A.2d at 644. It is true, as Father asserts, that the trial court considered the bonding which Steven has with his foster family. The trial court did not, however, apply the bonding principle to an impermissible degree. Specifically, the trial court found

> that the termination of parental rights of Steven's father and mother will best serve the needs and welfare of Steven. Steven has resided in his foster home for more than seven years. He regards the foster family as his family. He has adjusted well to the home—he is described as a very nice and well-functioning youngster. The possibility that he might be removed from this home

creates significant pain and stress. The foster parents wish to adopt. Steven has almost no relationship with his natural parents so termination will not disrupt an existing parent-child relation. Adoption by the foster parents, on the other hand, will give legal recognition to a family which in every important sense already exists.

\* \* \* \* \* \*

It is clear that Steven's return to his natural family would be contrary to Steven's best interests. Even the expert witness whom the parents presented testified that Steven should not be returned unless Steven favors the return. The options proposed to this court by the two professionals are either to give Steven a permanent home with his foster parents or to leave Steven in the foster home as a foster child because of the possibility that as he grows older he may wish to establish a relationship with his natural parents. For the reasons previously discussed, the first option will best serve Steven's needs and welfare.

Trial Court Opinion at 23–24, 27–28 (footnote omitted). The trial court has thoroughly considered the evidence of record and has properly concluded that Steven's welfare will be best served by termination. It would be detrimental and unfair to Steven to permit the situation to continue as it has, where eight years has passed with no progress and where it does not appear that the situation will change due to the parents' unwillingness to acknowledge their problems and work towards a solution. Under these circumstances, the trial court properly determined that termination will best serve Steven's needs and welfare.

Furthermore, while the facts of *Donna* are somewhat similar to the facts of the present case, *Donna* does not control the outcome of this case. As Father asserts, the Court in *Donna* did not place much weight on the fact that there was little interaction between the mother and her children during their visits, which were supervised by a caseworker and a foster parent. In the present case, more than "little interaction" is present. Father's visitation

rights were terminated because of the adverse effects they were having on Steven. In addition, the mother in *Donna* was willing to work with agencies recommended by C & YS in order to learn to deal with her daughter's problems. Finally, the Court in *Donna* recognized that in considering the importance of stability to a child's welfare, the reasons why the child has been with the third party for so long must be taken into account. *Id.*, 325 Pa.Superior Ct. at 61, 472 A.2d at 646. In *Donna,* the child had been in foster care for five years. However, for four of the five years the mother had been trying to regain custody of her child, and the delay was caused in large part by the courts. In the present case, Steven has been in foster care for eight years because of the lack of progress on the part of appellants. For these reasons, *Donna* is distinguishable from the present case.

■ Additionally, Father contends that the trial court improperly applied the best interests of the child approach. In a termination case, the trial court must not apply a best interests analysis in the sense of balancing the foster home and the natural parents' home. *See In re Coast,* 385 Pa.Super. 450, 561 A.2d 762 (1989) *(en banc), allocatur denied,* 525 Pa. 593, 575 A.2d 560 (1990). However, the trial court must, as it did in the present case, consider the child's needs and welfare. Although the trial court used the term "best interests" at one place in its opinion, *see* Trial Court Opinion at 27, it did not employ a best interests/weighing of the families analysis.

In his final issue, Father argues that the trial court misinterpreted the testimony of appellants' expert witness, Dr. Bansavage, that Steven should not be returned to his natural parents unless he favors it. We summarily reject Father's assertion that the trial court interpreted Dr. Bansavage's testimony to mean that "the child would decide the matter." Father's Brief at 42. Furthermore, the trial court accurately summarized the substance of Dr. Bansavage's testimony in its opinion. *See* Trial Court Opinion at 17–20. Moreover, Dr. Bansavage did in fact testify that in order for Steven to be successfully returned to his natural

parents, he would need "proper counseling and a desire to return." Notes of Testimony, 11/13/90, at 31. He also stated that although he did not recommend termination, he "would not force [reunification] at the present time" in light of the fact that Steven did not appear to want reunification. *Id.* at 32. We conclude that Father's allegation of error is meritless.

## II. MOTHER'S APPEAL

■ We will now address the issues Mother raises in her brief. She first contends that the trial court erred in finding that sufficient grounds for termination of her rights were supported by clear and convincing evidence. She contends that "the conditions leading to the removal of the children [sic] do not remain in effect since some of the conditions pertaining to the inadequate housing have indisputably been remedied and the difficulties involved in the feeding and caring for an infant who is in a body cast are no longer present." Mother's Brief at 9. This argument misrepresents the nature of the problem, however. Steven was not removed from the natural parents' home merely because of inadequate housing and the difficulties resulting from his cast. Steven was removed from the home because he was receiving inadequate care. Steven was extremely malnourished, bruised, and suffering from a broken leg. Appellants' failure to acknowledge their parental inadequacies and to attempt to remedy them reveals that the conditions leading to Steven's removal are, as the trial court found, still present. Steven's physical condition when he was removed was a symptom of an underlying problem. Because that problem has not been identified or resolved, the conditions leading to Steven's removal have not been remedied.

■ Mother also argues that it is "not proper to deny [her] her parental rights because of any difficulties which her husband may have had in dealing with Children and Youth Services." Mother's Brief at 10. It is true that Mother's relationship with C & YS has not been antagonis-

tic as has Father's. It is also true that Mother's visitation with Steven was not terminated as was Father's. However, it is also true that Mother has not shown a willingness to meaningfully participate in the services offered by C & YS and to develop the skills and the insights which are necessary for Steven's return.

As to Mother's second issue, namely, whether termination will best serve Steven's needs and welfare, we have already discussed our agreement with the trial court's conclusions.

For the above reasons, we conclude that the trial court properly concluded that the requirements of section 2511(a)(5) have been proven by clear and convincing evidence. We therefore affirm the final judgment.

Final judgment affirmed.

CIRILLO, J., files a dissenting opinion.

CIRILLO, Judge, dissenting:

I must respectfully dissent. After a careful review of the record, I find that Children and Youth Services (CYS) did not prove by clear and convincing evidence that the natural parents are unable and unwilling to remedy the conditions that led to the removal of their son from their care.

Steven S. was removed from his parental home when he was two months old. He has not yet been returned to his parents. The trial court, in its opinion, stated that "[t]he incidents that led to Steven's removal strongly suggested that Steven's birth had disrupted the functioning of this family." Steven is now nine years old. It strains credulity to suggest that the same stress and disruption caused by a newborn's constant need for attention exists today. The trial court clearly states that "this case is unusual in that there are presently four other children in the home. *The children appear to be doing well in a family that appears to be providing appropriate care.*" Moreover, the majority readily admits that "C & YS caseworkers stated that [the father] was fit to be around children, and that psychological tests did not reveal a propensity for child abuse."

To me, this case is a testament to an agency that has lost sight of its mission. Steven was removed from his home under authority conferred by the Juvenile Act, 42 Pa.C.S.A. § 6301 *et seq.* The primary purpose of the Juvenile Act is to *"preserve the unity of the family whenever possible* and to provide for the care, protection and wholesome mental development of children...." 42 Pa.C.S.A. § 6301(b)(1) (emphasis added). This court has clearly established that "[a]ny decision to remove the child from his home must be reconciled with the paramount purpose of preserving the unity of the family." *In re Angry,* 361 Pa.Super. 180, 184, 522 A.2d 73, 75 (1987), *quoting In re Frank W.D.,* 315 Pa.Super. 510, 518, 462 A.2d 708, 712 (1983); *Interest of LaRue,* 244 Pa.Super. 218, 366 A.2d 1271 (1976). In order to insure that the goals of the Juvenile Act are carried out, our legislature mandated that a disposition review hearing be conducted at specified intervals "for the purpose of determining whether placement continues to be best suited to the protection and physical, mental and moral welfare of the child." 42 Pa.C.S.A. § 6351(e). Despite the unequivocal goal of the Juvenile Act, the procedural safeguards incorporated in that legislation, and the emphasis on preservation of the family evident in the case law of the Commonwealth, Steven has been separated from his family, over their strenuous objections, for nearly nine years. Under the circumstances of this case, I find such an extended separation counterproductive and utterly without justification.

The record reveals that there was a constant, antagonistic relationship between CYS and Steven's father. According to the trial court, the father insisted that "matters be done his way because C & YS's methods were based on its bureaucratic needs rather than on the needs of the parents and their children. *C & YS's caseworkers viewed the father's responses as a validation of their beliefs that his personality traits prevented him from being a competent parent for Steven.* They responded to the father's attacks on C & YS by assuming a defensive position."

C & YS is the state social service agency charged with the responsibility of facilitating reunification of families whose children have been temporarily removed. CYS is ostensibly staffed by professionals—dispassionate individuals trained to work with parents in order to improve the situation which necessitated the removal of their child. For presumably trained social workers to react defensively and distort a distraught father's antagonism toward a bureaucracy into justification for separating a child from his parents for nearly nine years is reprehensible indeed. For a trial court to involuntarily terminate the parental rights of the natural father and mother on the basis of the prolonged separation and CYS's biased recommendation constitutes a manifest abuse of discretion.

I would reverse the trial court's order involuntarily terminating the S.'s parental rights to their son Steven. Mr. and Mrs. S. are competent parents; the admitted well-being of the four children currently residing with them attests to their parenting abilities. I cannot condone punishing the parents by depriving them of their son because of the wanton lack of professionalism exhibited by CYS in its handling of this case.