J-A20017-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF P.K.R.C. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF K.H. | |
| | No. 720 EDA 2022 |

Appeal from the Decree Entered February 22, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000442-2021

| | |
|---|---|
| IN THE INTEREST OF K.M.C. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF K.H. | |
| | No. 721 EDA 2022 |

Appeal from the Decree Entered February 22, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000443-2021

BEFORE:  STABILE, J., MCCAFFERY, J. and PELLEGRINI, J.[*]

_____

[*] Retired Senior Judge assigned to the Superior Court.

MEMORANDUM BY STABILE, J.:                    **FILED SEPTEMBER 14, 2022**

K.H. ("Mother") appeals from two decrees granting the petitions of the Department of Human Services ("DHS") to involuntarily terminate her parental rights over her two children, K.M.C. (born July 31, 2011) and P.K.R.C. (born April 1, 2014).[1]  We affirm.

Mother raises the following issues in her brief:

1. Whether the Trial Court erred in terminating [Mother]'s parental rights under 23 Pa.C.S.A. § 2511(a)(1), the evidence having been insufficient to establish [Mother] had evidenced a settled purpose of relinquishing her parental claim, or having refused or failed to perform parental duties.

2. Whether the evidence was sufficient to establish that [Mother] had refused or failed to perform parental duties, caused Child to be without essential parental care, that conditions having led to placement had continued to exist, or finally that any of above could not have been remedied under 23 Pa.C.S.A. §§ 2511(a)(1), 2511(a)(5), and 2511(a)(8).

3. Whether the evidence was sufficient to establish that termination of parental rights would best serve the needs and welfare of the Minor Child, under 23 Pa.C.S.A. § 2511(b).

4. Whether the Trial Court erred in disallowing [Mother] to call to testify her Therapist John Radcliffe.

Mother's Brief at 5.

We review the first three issues together, because they all concern the same question: whether termination of Mother's parental rights was proper

_____

[1] In the same decrees, the court also terminated the parental rights of the children's father, R.J.C. ("Father").  Father did not appeal from either decree.

under Section 2511(a) and (b). We review an order terminating parental rights in accordance with the following standard:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We apply the standard of clear and convincing evidence, which is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the

parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child with close attention paid to the effect on the child of permanently severing any such bond. **In re L.M.**, 923 A.2d 505, 511 (Pa. Super. 2007). This Court need only agree with the lower court as to any one subsection of Section 2511(a) and any one section of Section 2511(b) in order to affirm. **In re Adoption of C.J.J.P.**, 114 A.3d 1046, 1050 (2015).

We have reviewed the certified record, the briefs of the parties, the applicable law, and the extensive and comprehensive opinion authored by Judge Tereshko, dated October 8, 2021. Following a detailed factual and procedural history of this case in pages 2-28 of his opinion, Judge Tereshko found that Mother's conduct satisfied statutory grounds for termination under Sections 2511(a)(1), (a)(5), and (a)(8).[2] Judge Tereshko reasoned:

---

[2] Section 2511(a)(1) requires proof of "conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." Section 2511(a)(5) requires proof that "[t]he child has been removed from the care of the parent by the
*(Footnote Continued Next Page)*

This Court heard clear and convincing evidence from Taylor Gore, APM/CUA2 Case Manager, who testified the family first became known to DHS when Mother gave birth on April 1, 2014, to P.K.R.C., and she tested positive for cocaine with no prenatal care. A GPS Report dated 4/2/2014 was created that reflected that information, and APM provided in-home services to the family. On July 5, 2015, another GPS report occurred when K.M.C. was found wandering the streets alone without shoes or a shirt. He was left alone with no food in the house. He also had cognitive delays and there was potential drug use by his parents. On July 15, 2014. K.M.C. was again found wandering alone blocks away from the home. At that time Mother was working seven days per week and Father was always under the influence of substances. Ms. Gore testified that in-home services again were implemented to try to remediate these concerns.

Ms. Gore stated the next GPS report received for the family was March 28, 2016, where the allegations were lack of supervision and Father was arrested. There was another GPS report dated November 14, 2016, when K.M.C. had a head lice problem and was diagnosed with ADHD and was not receiving services. Mother also had a history of substance abuse, and the housing was inadequate because the Children were sleeping on the floor with only blankets. At that time the Children's uncle was caring for them via a safety plan. Ms. Gore noted that nearly after two years of in-home services, then it was determined that services were no longer needed and APM/CUA needed to take the next step. An Order of Protective Custody (OPC) was obtained for the

_(Footnote Continued)_ ————————————

court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child." Section 2511(a)(8) requires proof that "[t]he child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child."

Children on December 13, 2016, when the Children were removed from Mothers care.

Ms. Gore testified the Children were Adjudicated Dependent on January 11. 2017, and they were placed in Foster Care. Mother was informed of the Single Case Plan (SCP) objectives for reunification with her Children. These objectives included mental health treatment, drug and alcohol dual diagnosis treatment, adequate housing, parenting classes, employment, and visitation with her Children.

Regarding drug and alcohol and mental health objectives for Mother, Ms. Gore testified Mother attends NET, where she has attended for over four years and she receives methadone dosages weekly. Mother has been compliant as far as drug screens, and she has had positive drug screens throughout the life of the case, but not at this time. Ms. Gore noted that the dual diagnosis objective is still considered outstanding because Mother continues to use Methadone and has not been successfully discharged in which she is not receiving any doses of anything.

Regarding mental health treatment, Ms. Gore testified that continues to be an objective. She was not aware of a specific diagnosis, but the objective requires individual therapy consistent with her drug and alcohol treatment. Regarding parenting, Ms. Gore testified Mother was referred to ARC for parenting throughout the life of the case. She completed parenting back in 2018, and again in 2020. Mother recently self-enrolled into a parenting class again through the NET community care in which the class will begin [on] 2/23/2022. Ms. Gore opined that although Mother has attended three parenting classes, she has observed that Mother continues to have difficulties parenting her Children during visits. She has observed Mother during visits five times since the last court days and notes that Mother is unable to redirect the Children. The Children do not listen to Mother's direction, and instead they continue to do whatever they want. Ms. Gore continues to have safety concerns for the Children when they are with Mother. She has observed the Children at their home every month and notes that the Children behave differently with their caregiver, once they are given a directive to stop certain behavior then they immediately stop and adjust their behavior. She opined the

- 6 -

Children have a different respect level with the caregiver than with Mother.

Regarding employment, Ms. Gore testified Mother has been employed at different times during the life of the case. Mother is currently employed and she submitted a pay stub for December of 2021 from Cracker Barrel, where she works as a waitress. Mother also reported she received money through the Pandemic Relief Fund during 2020 but did not report any Unemployment Compensation. Ms. Gore stated employment continues to be an outstanding objective because Mother has not provided documentation that she can maintain employment for six months or more on a consistent basis.

Regarding housing, Ms. Gore testified Mother reported to her on 2/11/2022, that she was living with her Aunt, but she has not been able to view the home for reunification purposes. Mother completed an ARC program for housing in 2019, and then she moved to Maryland in 2020, and the process began to assess the home. Mother then refused to cooperate with the assessment, and she moved back to Philadelphia in 2021. Mother then completed classes from Genesis Housing Corporation and presented a document dated February 9, 2022, noting she received a two-hour course for information on credit rating systems, disputing information, debt reduction and improving credit scores. Therefore, Ms. Gore opined Mother is not any closer to obtaining housing than she was before, and housing continues to be an outstanding objective.

Regarding visitation, Ms. Gore testified that Mother's visits were unsupervised since 2018, and there was a period in 2020 for 5 to 6 months, when Mother's whereabouts were unknown, and visits did not occur. She noted that when Mother reappeared in 2021 the visits were reduced from 4 hours to 2 hours. Mother also had virtual visits with the Children off and on throughout the summer of 2021. In November 2021, this Court ordered supervised visits to assess the quality of the visits. Ms. Gore testified that [the] first visit in the fall of 2021 was at a Market and Mother's paramour was present. She observed inappropriate behavior of the paramour towards P.K.R.C. where he touched her a few times, rubbing her hair and her back. She informed Mother that clearances were required for the paramour and that he should not be present for the visits.

Clearances were later run on the paramour and he did not pass the review and he could not be around the Children. Ms. Gore then supervised two visits in December 2021, the first one was a virtual visit and the paramour actually spoke to the Children through the telephone, and Mother was seen vaping during the visit. Mother was asked to stop vaping on the screen, and she did comply. The second visit was to occur at the library at Broad and Erie Streets, however, the library was closed, and the visit began outside a pizza shop. Ms. Gore ended the visit quickly because it was very cold outside. She testified that she observed four visits totally and there were safety concerns during all of the visits due to Mother having difficulty locating a safe place for the visits. Ms. Gore noted she allowed Mother to make the decision on her own as to where and how the visits with her Children were conducted. Ms. Gore recommended that visits between Mother and the Children be supervised by the Agency. Mother's visits occurred haphazardly on the street, in pizza shops or in a van, and Mother continues to not be able to provide a safe space for the visits. Ms. Gore testified Mother did not assist the Children with their homework, nor did she schedule medical or dental appointments.

Opinion, 5/5/22, at 31-35 (record citations omitted).

Next, Judge Tereshko analyzed whether termination of parental rights was in the best interests of the children under Section 2511(b):

In this case, this Court had adequate evidence of the status of the parent-child bond to examine and determine whether terminating Mother's parental rights would destroy a necessary and beneficial relationship. This Court heard credible, persuasive testimony from Ms. Gore who testified K.M.C., who is 10 years old, is currently placed with the same Caregiver since March of 2020. He currently receives behavioral health services through Gemma with no medical management for his ADHD diagnosis. He has a BSC worker and mobile therapy through Gemma also, as well as child prep. She noted the Caregiver, with assistance from the Agency, arranged for all of these services. Ms. Gore noted Mother has never requested information so she can be in touch with his treatment team nor to see how he is doing in treatment. Mother has never asked for education nor school information, however, the Caregiver gives Mother updates and information. She noted the Child is doing great in the home and

that he has a very close relationship with his Caregiver. He is respectful and listens to her instruction. He is doing well in school and she provides him with incentives to keep him engaged.

Ms. Gore opined K.M.C. has a parental bond with the Caregiver and looks to her when in need of anything. His Caregiver meets all of his educational, therapeutic, medical, behavioral and spiritual needs. She has discussed Adoption with K.M.C. and he is not opposed to being adopted by her. Ms. Gore opined K.M.C. would not suffer irreparable harm if Mother's parental rights were terminated.

Regarding P.K.R.C., who is 7½ years old, Ms. Gore testified she is currently placed in a Treatment level Foster Home through Gemma and has been there since May of 2021. She receives mental health services through Bethanna and attends Lingelbach Elementary School in the 2nd grade. Ms. Gore noted the Caregiver ensures that the Child's behavioral health services, medical and educational needs are being met.

P.K.R.C. looks to the Caregiver for all of her daily needs and for safety and assistance. She has observed the relationship between the Child and the Caregiver, and she opined there is parental bond between them. Ms. Gore opined P.K.R.C. would not suffer irreparable harm if Mother's parental rights were terminated and that both K.M.C. and P.K.R.C.'s best interests would be served to be adopted and have permanency.

On cross-examination by Jay Stillman, Esquire, attorney for Mother, Ms. Gore noted that both Children love their Mother, and both want to be with her.

Mother testified that she completed seven sessions of parenting education at NET Treatment Centers on September 12, 2020 and presented a Certificate of Completion. Mother stated she learned about emotional support guidance and educational guidance. Mother testified she consults with the Caregivers regarding the Children's progress and care and is involved in that manner. Mother noted that K.M.C.'s progress has been amazing since he has been with the Caregiver and she only wants the best for him.

Regarding P.K.R.C., Mother testified she also discusses the Child's progress and care with the Caregiver. Mother knows the Child has a lot of different behavioral problems where she doesn't want to listen, and she has issues with lying.

Mother testified about various housing programs she wants to get help for home buying, trying to get a grant and her problems with having no credit. She noted she signed up for the program at Genesis Housing Corporation in November of 2021, and she attends now. Mother testified she is employed at Cracker Barrel now and her salary is garnished for child support at the rate of $93.00 per week for the support of her 18-year-old daughter in New Jersey. Mother stated she has attempted to obtain housing but it has been difficult. She rents a hotel room and that is where most of her earnings go, towards paying the hotel. She stated she received $600 per week in unemployment benefits and also received food stamps. Mother testified she is currently staying with her Aunt to try and save money. Mother stated she considered "living a van life," where she fixes up a van to be like a hotel room and she can live out of the van.

On cross-examination by Megan Fitzpatrick, Esquire, attorney for DHS, Mother testified she was battling drug addiction during the early years of the Children's placement and that all of the money she had would go towards buying drugs. Mother noted her drugs of choice were heroin and crack cocaine. Mother testified she is sober now and continues to fight for her sobriety in order to not go backtracking into addiction.

Michael Angelotti. Esquire, TPR counsel, informed the Court that he was appointed to the case in August 2021, and he interviewed the Children in December 2021. He stated the Children have gone through the Adoption Prep and they are okay with being adopted by the Foster Parents.

*Id.* at 36-39 (record citations omitted).

We agree with Judge Tereshko that the evidence was sufficient to satisfy Section 2511(a)(1). DHS filed its petition for the involuntary termination of Mother's parental rights on August 6, 2021, making the Section 2511(a)(1) six-month look-back period February 6, 2021 to August

- 10 -

6, 2021. Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. *In re D.J.S.*, 737 A.2d 283, 286 (Pa. Super.1999). The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination. *Id.* at 285.

Here, the children were in foster care between February and August 2021. A parent of child in foster care has an affirmative duty to cooperate with the agency, work towards reunification, and remedy the conditions that led to the child's continued placement. *In re Julissa O.*, 746 A.2d 1137, 1141 (Pa. Super. 2000) (parent has an affirmative duty to work toward the child's return and this duty exists when child is placed in foster care).

The children were removed from Mother's care due to her housing, substance abuse and mental health issues, which caused the children to be without proper parental care, control, supervision and safety. The initial permanency goal was family reunification and her SCP objectives included dual-diagnosis treatment, parenting classes, employment, housing and visitation. These objectives remained consistent throughout the case. The dual-diagnosis objectives of mental health treatment and substance abuse treatment were foundational objectives, as Mother implicitly acknowledged

- 11 -

when she testified that her drug use and attempts to stay sober were the cause of her housing issues, which persisted throughout the life of the case. The evidence establishes that Mother failed to report for random drug screens on February 15, 2017 and March 20, 2017, and tested positive for cocaine on June 27, 2017, October 4, 2017, November 1, 2017 and January 24, 2018. Although Mother attended substance abuse and mental health treatment at NET for four years, she was not successfully discharged from the program as of the February-August 2021 look-back period. Instead, at the time of the termination hearing, she was enrolled in, and had not completed, a methadone maintenance program, thereby establishing that she had not successfully alleviated the substance abuse issue that led to the children's placement.

Although Mother completed multiple parenting programs, she failed to put what she learned into practice and failed to perform her parental duty to provide proper care for the children. Ms. Gore testified that despite Mother having unsupervised visitation with the children for over four years, Mother failed to assist with their everyday needs, since she never reported that she helped them with their homework, scheduled their dental or medical appointments, or participated in any of their therapeutic services.

Mother also failed to achieve a period of continuous employment during the six-month look-back period, thus failing to demonstrate the ability to provide financial stability for the children. Even though Mother

testified that she attended housing programs that provided her with information concerning personal finance and credit, and that she had about $600.00 in savings, she did not have a plan to achieve financial stability and obtain housing for herself.

Mother claims that the trial court erred in terminating her parental rights pursuant to subsection (a)(1) because the evidence does not support a finding that she evidenced a settled purpose to relinquish her parental claim to the Children. Appellant's Brief, p. 15. This argument fails because the court did not find, and DHS did not proceed under the theory, that Mother evidenced a settled purpose to relinquish her parental claim. Instead, the evidence established, and the court found, that Mother failed to perform her parental duties for the statutory period under Section 2511(a)(1). *See* Opinion at 40-42. Since we agree that the evidence was sufficient to satisfy Section 2511(a)(1), we need not address whether the evidence was sufficient to satisfy subsections (a)(5), and (a)(8). *In re Adoption of C.J.J.P.*, 114 A.3d at 1050.

We further agree with Judge Tereshko that the evidence was sufficient to satisfy Section 2511(b). Once the court has found that the statutory requirements for involuntary termination of parental rights have been met pursuant to Section 2511(a), the court must determine under Section 2511(b) whether severing the parent-child relationship is in the child's best interest. *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003).

Subsection 2511(b) involves a "needs and welfare" analysis by the trial court which focuses solely on the child in entering a decree terminating parental rights. In re I.G. and J.G., 939 A.2d 950, 956 (Pa. Super. 2007).

The Superior Court has explained the Section 2511(b) analysis as follows:

> Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of a child. The trial court also must discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. The extent of the bond-effect analysis necessarily depends upon the unique facts and circumstances of the particular case.
>
> We observe that an Orphans Court is not required by statute or precedent to order a formal bonding evaluation by an expert. Indeed, in assessing the parental bond, the orphans' court is permitted to rely upon the observations and evaluations of social workers. Moreover, the mere existence of an emotional bond does not preclude the termination of parental rights.
>
> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012) (citations and indentations omitted), *overruled on other grounds by In re Adoption of L.B.M.*, 163 A.3d 172 (Pa. 2017).

In determining whether a bond exists between a parent and child, "[t]he bonding cannot be in one direction only… but must exhibit a bilateral relationship which emanates from the parents' willingness to learn

appropriate parenting, [and] drug rehabilitation." ***In re K.K.R.S.***, 958 A.2d 529, 534 (Pa. Super. 2008). Where a child's relationship with his parent is unhealthy and impedes his ability to attach to a preadoptive family, it cannot be considered a beneficial bond. ***In re T.S.M.***, 71 A.3d 251, 271 (Pa. 2013). In analyzing the child's best interest, the court must consider the importance of stability to the child, the reasons why the child was in care for so long, and the child's relationship with his pre-adoptive caregivers in rendering its decision. ***In re Steven S.***, 612 A.2d 465, 471 (Pa. Super. 1992).

The record supports Judge Tereshko's decision that the termination of Mother's parental rights would not cause the Children to suffer irreparable harm. Ms. Gore testified that K.M.C. and P.K.R.C. each share a parent/child bond with their respective preadoptive foster parent, are not opposed to being adopted, and that any issues that might result from the termination of Mother's parental rights could be addressed in their weekly therapy sessions. Ms. Gore's testimony is consistent with the Children's legal counsel, who stated that he met with the Children, who both told him that they agreed with adoption by their respective resource parents. Based on this record, the trial court properly found that neither Child would suffer irreparable harm, and that their needs and welfare were best served by terminating Mother's parental rights and freeing them for adoption by their respective foster parent.

Even if Children had a bond with Mother, "the mere existence of an emotional bond does not preclude the termination of parental rights." **K.M.**, 53 A.3d at 791. In determining whether to terminate parental rights,

> … the trial court can equally emphasize the safety needs of the child, and should consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

**Id.** "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." **T.S.M.**, 71 A.3d at 268. The record, establishes that each child was in a preadoptive home and bonded with his or her respective foster family. Thus, the trial court properly concluded that each child's developmental, physical and emotional needs and welfare was best served by termination of Mother's parental rights.

For these reasons, Judge Tereshko's order terminating Mother's parental rights over both children was proper under Section 2511(a) and (b).

In her final argument, Mother contends that the trial court erred in excluding the testimony of her former therapist, Mr. John L. Radcliffe, Jr., M.S., L.P.C., who would have provided testimony concerning her Methadone maintenance treatment and level of cure. We review this evidentiary ruling

for abuse of discretion. ***In re Adoption of R.Y.***, 72 A.3d 669, 675 (Pa. Super. 2013).

Judge Tereshko concluded that this testimony was unnecessary, reasoning:

> This Court asked Mr. Stillman [Mother's attorney] if he would stipulate to the fact that Mother is in methadone maintenance treatment and receiving weekly drug and alcohol treatment. He did not agree and stated that it his impression that it was not believed that Mother's issues had resolved because she is still on methadone. The former therapist's testimony would testify that Mother has achieved a level of cure, not that he would testify that Mother no longer needs methadone maintenance. Mr. Stillman's request to call Mother's former therapist was denied because this testimony was not to be about Mother's ongoing treatment in methadone maintenance and would not offer any additional information to this Court.

Opinion at 39-40. Based on this analysis, we conclude that preclusion of the therapist's testimony was a proper exercise of discretion.

For these reasons, we affirm Judge Tereshko's order terminating Mother's parental rights over K.M.C. and P.K.R.C.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/14/2022